IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CATHRYN A. BRONSON,              )
                                )
                Plaintiff,       )
                                )   CIVIL ACTION
v.                              )
                                )   No. 06-4142-JAR-JTR
                                )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security,  )
                                )
                Defendant.       )
_____ )


## REPORT AND RECOMMENDATION

Plaintiff seeks review of a final decision of the
Commissioner of Social Security (hereinafter Commissioner)
denying disabled widow benefits (DWB) and supplemental security
income (SSI) under sections 202, 216(i), 223, 1602 and
1614(a)(3)(A) of the Social Security Act.  42 U.S.C. §§ 402,
416(i), 423, 1381a, and 1382c(a)(3)(A)(hereinafter the Act).  The
matter has been referred to this court for a report and
recommendation.  The court recommends JUDGMENT be entered
pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING
the Commissioner's decision.

I.   Background

Plaintiff applied for SSI on Feb 11, 2003 (R. 44, 90-95) and
for DWB on Oct. 8, 2004.  (R. 44, 489-92).  She alleges onset of

disability when she attained age fifty on May 17, 2003.  (R. 44, 512).  Plaintiff's applications were denied and plaintiff timely sought a hearing before an Administrative Law Judge.  (R. 57, 58, 69-70).  Plaintiff, who was represented by an attorney, appeared and testified at a hearing on Nov. 4, 2004 and at a supplemental hearing on Apr. 27, 2005.  (R. 509-49).  She argued at each hearing that she is disabled because she is over fifty years of age, has no past relevant work, and is limited to performance of sedentary work.  Id.  Between the hearings, the ALJ sought and received answers to interrogatories from a vocational expert.  (R. 184-85).  The ALJ issued a decision on Jun. 30, 2005 finding plaintiff is not disabled within the meaning of the Act.  (R. 44-55).

The ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date.  (R. 46).  At step two of the sequential evaluation process, the ALJ found that plaintiff has "severe" impairments of degenerative disc disease and a headache disorder, but that plaintiff does not have a mental disorder which is "severe" within the meaning of the Act. (R. 46-49).  He found at step three that none of plaintiff's impairments meets or equals the severity of a medical listing and determined that he must assess plaintiff's residual functional capacity (RFC).  (R. 49-50).  The ALJ determined that plaintiff's

allegations of limitations resulting from her impairments are not credible. (R. 51).

The ALJ considered the medical opinions of plaintiff's chiropractor; a psychological consultant, Dr. Mintz; plaintiff's therapists, Marie Frazee, LPC, and Patricia Miller, LMLP, LCP; Plaintiff's treating orthopedic specialist, Dr. Lewonowski; and the state agency medical consultants who had completed a physical RFC assessment form and a Psychiatric Review Technique Form (PRTF) during the state agency reviews of plaintiff's applications. (R. 52, 52A, 53). The ALJ discounted the opinions of Ms. Frazee and Ms. Miller and gave substantial weight to the opinions of the state agency medical consultants regarding plaintiff's mental condition. (R. 52A-53). The ALJ assessed plaintiff with an RFC which falls within the light exertional level. (R. 52).

At step four, the ALJ found that plaintiff has no past relevant work within the meaning of the Act. (R. 53). The ALJ proceeded to the fifth step of the sequential evaluation process, and based upon the answers provided by the vocational expert and using Medical-Vocational Guidelines (hereinafter the grids) Rule 202.13, concluded that plaintiff is able to perform other work existing in significant numbers in the national economy. (R. 53-54). Therefore, the ALJ denied plaintiff's applications. Plaintiff disagreed with the ALJ's decision, provided additional

evidence, and sought Appeals Council review.  (R. 13-35, 39-40).
The Appeals Council found no basis for review and denied
plaintiff's request.  (R. 6-8).  Therefore, the ALJ's decision is
the final decision of the Commissioner.  (R. 6); Threet v.
Barnhart, 353 F.3d 1185, 1187 (10th Cir. 2003).  Plaintiff now
seeks judicial review.

## II.  Legal Standard

The court's review is guided by the Act.  42 U.S.C.
§§ 405(g), 1383(c)(3).  Section 405(g) provides, "The findings of
the Commissioner as to any fact, if supported by substantial
evidence, shall be conclusive."  The court must determine whether
the factual findings are supported by substantial evidence in the
record and whether the ALJ applied the correct legal standard.
Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); White v.
Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial
evidence is more than a scintilla, but less than a preponderance,
it is such evidence as a reasonable mind might accept to support
the conclusion.  Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th
Cir. 2004); Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).
The court may "neither reweigh the evidence nor substitute [it's]
judgment for that of the agency."  White, 287 F.3d at 905
(quoting Casias v. Sec'y of Health & Human Serv., 933 F.2d 799,
800 (10th Cir. 1991)); Hackett v. Barnhart, 395 F.3d 1168, 1172
(10th Cir. 2005).  The determination of whether substantial

-4-

evidence supports the Commissioner's decision, however, is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual can establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d).  The claimant's impairments must be of such severity that she is not only unable to perform her past relevant work, but cannot, considering her age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  Id.

The Commissioner has established a five-step sequential process to evaluate whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920 (2005); Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir. 2004); Ray, 865 F.2d at 224.  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has severe impairments, and

-5-

whether the severity of her impairments meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Id. at 750-51.  If plaintiff's impairments do no meet or equal the severity of a listing, the Commissioner assesses claimant's RFC.  20 C.F.R. §§ 404.1520, 416.920.  This assessment is used at both step four and step five of the process.  Id.

After assessing claimant's RFC, the Commissioner evaluates steps four and five--whether the claimant can perform her past relevant work, and whether she is able to perform other work in the national economy.  Williams, 844 F.2d at 751.  In steps one through four the burden is on claimant to prove a disability that prevents performance of past relevant work.  Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show other jobs in the national economy within plaintiff's capacity. Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff claims the ALJ erred at step two in failing to find that plaintiff's mental impairment is "severe" within the meaning of the Act; and at step five both in finding that there are jobs in the economy of which plaintiff is capable, and in using grid Rule 202.13 to determine that plaintiff is not disabled.  The Commissioner argues that the ALJ properly evaluated the severity of plaintiff's mental impairment at step

-6-

two and properly evaluated the medical opinions upon which the
step two determination is based, and that substantial evidence
supports the determination.   He argues that the ALJ properly used
grid Rule 202.13 as a framework for his step five determination,
and that substantial evidence supports the determination that
there are jobs in the economy of which plaintiff is capable.   The
court will consider the claims in the order in which they would
be reached in applying the sequential evaluation process.

**III. Step Two**

Plaintiff claims the ALJ erred at step two in finding that
plaintiff's mental impairment is not "severe" within the meaning
of the Act because the ALJ accorded too much weight to the
opinion of the Commissioner's consultant examiner, Dr. Mintz; and
too little weight to the opinions of plaintiff's treating mental
health providers.   She claims the ALJ failed to consider the
information in the third party statement completed by plaintiff's
daughter, and erred in failing to allow plaintiff's daughter to
testify at the hearing.   Finally, she claims the ALJ erred in
failing to include in the RFC assessment his findings that
plaintiff "has mild restrictions in activities of daily living,
mild difficulty maintaining social functioning, and mild
difficulty maintaining concentration, persistence, or pace."
(Pl. Br. 29).   The Commissioner notes that although Ms. Frazee
and Ms. Miller treated plaintiff, the treatment involved only one

visit each and the mental health providers do not qualify as treating physicians within the meaning of the regulations.  He notes that the ALJ considered the opinions of both mental health providers, and that any error in finding Ms. Frazee is not an acceptable medical source was harmless.  The Commissioner argues that the ALJ properly applied the Psychiatric Review Technique to evaluate the severity of plaintiff's mental impairment, and that substantial evidence in the record as a whole (including the additional evidence presented to the Appeals Council) supports the ALJ's finding that plaintiff's mental impairment is not "severe" within the meaning of the regulations.

An impairment is not considered severe if it does not significantly limit plaintiff's ability to do basic work activities such as walking, standing, sitting, carrying, understanding simple instructions, responding appropriately to usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521, 416.921.  The Tenth Circuit has interpreted the regulations and determined that to establish a "severe" impairment at step two of the sequential evaluation process, plaintiff must make only a "de minimis" showing.  Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).  Plaintiff need only show that an impairment would have more than a minimal effect on her ability to do basic work activities.  Williams, 844 F.2d at 751.  However, she must show more than the mere presence

-8-

of a condition or ailment.  Id. (citing Bowen v. Yuckert, 482

U.S. 137, 153 (1987)).  If an impairment's medical severity is so

slight that it could not interfere with or have a serious impact

on plaintiff's ability to do basic work activities, it could not

prevent plaintiff from engaging in substantial work activity and

will not be considered severe.  Hinkle, 132 F.3d at 1352.

The Commissioner has promulgated a Psychiatric Review

Technique for evaluating mental impairments in a disability case.

20 C.F.R. §§ 404.1520a, 416.920a.  In evaluating the severity of

mental impairments, the technique provides for rating the degree

of functional limitation in each of four functional areas:

activities of daily living; social functioning; concentration,

persistence, or pace; and episodes of decompensation.  Id.

§§ 404.1520a(c) 416.920a(c).  After rating the degree of

limitation in each functional area, the Commissioner determines

the severity of plaintiff's mental impairments.  Id.

§§ 404.1520a(d), 416.920a(d).

When the first three functional areas are rated as "none" or

"mild," and the fourth area is rated as "none," the agency will

conclude at step two of the sequential evaluation process that

plaintiff's mental impairments are not severe "unless the

evidence otherwise indicates that there is more than a minimal

limitation in [plaintiff's] ability to do basic work activities."

Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Here, plaintiff asserts that her mental impairment is "severe" within the meaning of the regulations.  Therefore, she must show that her mental impairment produces more than a minimal limitation in her ability to perform <u>basic</u> mental work activities such as understanding, carrying out, or remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; or dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521, 416.921 (giving examples of basic work activities--"the abilities and aptitudes necessary to do most jobs").  As discussed above, plaintiff must show more than the mere presence of a mental impairment.

Plaintiff claims that the ALJ erred in weighing the medical opinions, resulting in error in evaluating the severity of plaintiff's mental impairment.  Specifically, plaintiff claims the ALJ accorded too much weight to the opinion of the consultant examiner, Dr. Mintz; substituted the ALJ's medical judgment to conclude that the GAF[1] score of 60 Dr. Mintz assigned to

---

[1]A GAF (global assessment of functioning) score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30 (4th ed. 1994)(hereinafter DSM-IV).  The GAF Scale considers psychological, social, and occupational functioning on a hypothetical continuum from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  <u>Id.</u> at 32.  GAF is a classification system providing objective evidence of a

plaintiff indicates only mild limitations rather than moderate limitations; and erroneously accorded too little weight to the opinions of plaintiff's treating mental health providers including two licensed master's level psychologists, Ms. Frazee and Ms. Miller; a social worker, Ms. McDonald; and a psychiatrist, Dr. Williams; all of whom assigned plaintiff GAF scores of 53 or 55.[2]   The Commissioner argues that the ALJ did not find plaintiff's mental impairment is "not severe" solely on the basis of his finding regarding Dr. Mintz's GAF; that the ALJ properly considered all of the medical opinions; that Ms. Frazee and Ms. Miller are not "treating sources" within the meaning of the regulations; that the ALJ's error in stating Ms. Frazee is not an "acceptable medical source" is harmless; and that the evidence presented to the Appeals Council does not establish that plaintiff's mental impairment is of greater severity than found by the ALJ.

---

degree of mental impairment.  Birnell v. Apfel, 45 F. Supp. 2d 826, 835-36 (D. Kan. 1999) (citing Schmidt v. Callahan, 995 F. Supp. 869, 886, n.13 (N.D. Ill. 1998)).

[2]GAF scores of 53, 55, and 60 fall in the range (51-60) defined as, "**Moderate symptoms** . . . **OR moderate difficulty in social, occupational, or school functioning** (e.g. few friends, conflicts with peers or co-workers)."  DSM-IV at 32 (emphasis in original).  A GAF score in the range 61-70 however, is defined as, "**Some mild symptoms** . . . **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**"  DSM-IV at 32 (emphasis in original).

"Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [plaintiff's] impairment(s), including [plaintiff's] symptoms, diagnosis and prognosis, what [plaintiff] can still do despite impairment(s), and [plaintiff's] physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  The regulations include licensed physicians and licensed or certified psychologists within the meaning of "acceptable medical sources." Id., §§ 404.1513(a)(2), 416.913(a)(2).  The regulations provide that the Commissioner may use evidence from "other medical sources" such as nurse-practitioners, physician's assistants, and therapists, not on the list of "acceptable medical sources" to show the severity of plaintiff's impairments and how they affect her ability to work.  20 C.F.R. §§ 404.1513(d), 416.913(d).

Opinions from any medical source must not be ignored, and will be evaluated by the Commissioner in accordance with factors contained in the regulations.  20 C.F.R. §§ 404.1527(d), 416.927(d); Soc. Sec. Ruling (SSR) 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2007).  A medical opinion on the issue(s) of the nature and severity of a claimant's impairments provided by a treating source who has had an ongoing treatment relationship with a claimant is given controlling weight if is (1) is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and (2) is not inconsistent with the other substantial evidence in the case record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2007); see also, 20 C.F.R. §§ 405.1502, 416.902(defining "treating source").

This is so because a physician who has treated a patient frequently over an extended period of time is expected to have greater insight into the patient's medical condition.  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  But, "the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion."  Id. at 763 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995)).  However, opinions of examining sources are generally given more weight than the opinions of non-examining sources who have merely reviewed the medical record.  Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

Here, the ALJ discussed several opinions regarding plaintiff's mental impairment.  He discussed the opinions of

Michelle Chambers of Hull Chiropractic Clinic; of Dr. Mintz, a consultant psychological examiner; of Ms. Frazee and Ms. Miller, therapists who each examined plaintiff one time; and the opinions of the state agency medical consultants who had completed a physical RFC assessment form and a Psychiatric Review Technique Form (PRTF) during the state agency reviews of plaintiff's applications.  (R. 52, 52A, 53).

As the ALJ noted, Michelle Chambers, of Hull Chiropractic Clinic opined that plaintiff's impairments are uncomfortable but are not permanent and should not preclude plaintiff from holding a job.  (R. 52)(citing Ex4F/135 (R. 294)).  The ALJ determined not to give this opinion substantial weight because Ms. Chambers is not an "acceptable medical source," and because other evidence in the record indicates plaintiff has limitations in work activities.  (R. 52).

The ALJ noted Dr. Mintz's opinion that plaintiff is able to understand simple and intermediate instructions and has adequate concentration.  (R. 52).  He recognized that Dr. Mintz assigned plaintiff a GAF score of 60, and acknowledged that GAF scores in the range 51-60 represent moderate limitations in psychological functioning while scores in the range of 61-70 indicate "only mild limitations and generally functioning pretty well."  Id.  He concluded that Dr. Mintz did not find plaintiff's mental impairment limited her ability to perform basic work activities:

-14-

GAF scores include Axis IV factors, which in [Dr.
Mintz's report] were noted to be the claimant's
unemployment, reported medical problems, and pain,
which were considered severe.  Therefore, the GAF of
60, which is only 1 point below a GAF which would
indicate only mild limitations, reflects other factors
than the claimant's mental functioning.  Dr. Mintz'
[sic] conclusions clearly show that he considers the
claimant mentally capable of sustaining employment.

(R. 52-52A).

Plaintiff claims the ALJ summarily concluded plaintiff's

mental impairment is not severe based on Dr. Mintz's GAF score,

and improperly substituted his own medical judgment that Dr.

Mintz's GAF score of 60 "was close enough" to a score of 61 and,

therefore, indicated only mild rather than moderate limitations

in ability to perform basic work activities.  Plaintiff's

argument fails for several reasons.  First, it is the ALJ's duty

to evaluate the medical opinions and assign and explain the

weight given to each medical opinion.  20 C.F.R. §§ 404.1527(d),

416.927(d).  The fact that an ALJ may prefer one medical opinion

over another or may interpret a medical opinion such that the

opinion is internally consistent does not invariably mean that

the ALJ has substituted his medical judgment for that of the

medical source.  Plaintiff does not provide a citation to support

her argument that the ALJ erred in substituting his medical

judgment for that of Dr. Mintz, but a leading case in this

circuit for such a proposition is Winfrey v. Chater, 92 F.3d 1017

(10th Cir. 1996).  In Winfrey, the court found that the ALJ had

overstepped his bounds when he substituted his medical judgment
for that of Dr. Spray.  Id. at 1022.  The ALJ in Winfrey rejected
Dr. Spray's opinion because the ALJ found that the test relied
upon by Dr. Spray was an insufficient basis to make a diagnosis.
Id.  However, as the court noted, a physician, Dr. Goodman, did
not suggest that Dr. Spray's reliance upon the test was improper.
Id.  Thus, the ALJ in Winfrey substituted his own medical
judgment that the test was inadequate and was without a medical
basis for doing so.

     Second, the ALJ here did not substitute his own medical
judgment regarding plaintiff's GAF score.  Rather, he explained
why he accepted Dr. Mintz's opinion as he interpreted it (that
plaintiff's mental problems do not have more than a minimal
effect on her ability to perform basic work activities), despite
the doctor's assigning a GAF score of 60.  The ALJ noted that GAF
scores are in a continuum, and although a score of 60 is in the
range indicating moderate limitations in psychological
functioning, it is merely one point lower than the range
indicating "only mild limitations and generally functioning
pretty well." (R. 52).  He noted that a GAF score includes all
problems affecting a patient, and that in this particular case
Dr. Mintz's report reflects that his GAF score included problems
of unemployment, medical problems, and pain, all of which were
considered severe. (R. 52)(citing Ex. 7F/151-152 (R. 344-45)).

-16-

He also noted that Dr. Mintz's "conclusions clearly show that he considers the claimant mentally capable of sustaining employment." (R. 52A).  The ALJ weighed Dr. Mintz's opinion, he did not substitute his own medical judgment.

Third, the ALJ recognized that the problems considered in Dr. Mintz's GAF score assessment, but which were not related specifically to plaintiff's mental impairment (i.e. unemployment, physical medical problems) had been accounted for elsewhere in the ALJ's decision, and should not be used additionally to increase the severity assigned to plaintiff's mental impairment. He based his finding regarding Dr. Mintz's opinion on his analysis regarding the totality of Dr. Mintz's report, and consideration of factors as explained in the ALJ's decision.

Finally, the ALJ specifically noted that he had given substantial weight to the opinions of the state agency medical consultants.  Those consultants, who had also considered Dr. Mintz's report and noted Dr. Mintz's opinion that plaintiff's attention, concentration, and memory were adequate, also found that plaintiff's mental impairment is not severe.  (R. 348-64). The ALJ did not substitute his medical judgment for that of the physicians, rather, he weighed the medical opinions, explained his understanding of Dr. Mintz's opinion, and accepted Dr. Mintz's and the consultants' opinions that plaintiff's mental impairment is not severe.

The ALJ's determination is supported by the explanation of GAF scores in the American Psychiatric Association's Diagnostic and Statistical Manual (DSM-IV).  DSM-IV instructs practitioners to "Consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  Do not include impairment in functioning due to physical (or environmental) limitations."  DSM-IV at 32.  Thus, it was appropriate for the ALJ to discount that portion of Dr. Mintz's GAF which included unemployment and (physical) medical problems.  The GAF definition of range 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning; and the definition of range 61-70 indicates mild symptoms or some difficulty in social, occupational, or school functioning.  DSM-IV at 32.  Therefore, while a GAF score says something in a very general way about ability to perform basic work activities, the specific score assigned may relate more particularly to social or school functioning rather than occupational functioning.  Consequently, that the ALJ related Dr. Mintz's GAF score to his narrative report supports rather than detracts from the ALJ's analysis.

Plaintiff's argument that Dr. Mintz's GAF score of 60 is consistent with the GAF scores of 53 and 55 assigned by Ms. Frazee and Ms. Miller is not persuasive because it does not address which particular aspect(s) of functioning is primarily

reflected in the particular GAF scores.  The therapists' GAF scores may be addressing overall symptoms or social functioning rather than occupational functioning, which is the issue at step two of the sequential evaluation process.

The ALJ addressed the opinions of plaintiff's therapists, Ms. Frazee and Ms. Miller.  (R. 52A).  He noted that Ms. Frazee's opinion was expressed in a mental health center intake evaluation, and that Ms. Miller's opinion was expressed in Dec. 2004 treatment notes.  Id.  He discounted Ms. Frazee's opinion because "Ms. Frazee did not record any objective findings of disabling mental limitations," because Ms. Frazee is not an acceptable medical source, because Ms. Frazee's GAF score reflects factors in addition to mental functioning such as plaintiff's financial problems, and because Ms. Frazee's records do not reflect significant mental limitations beyond plaintiff's subjective reports which the ALJ found not credible.  Id.  He discounted Ms. Miller's opinion because Ms. Miller's records also reflect problems beyond mental functioning, and reflect only mild limitations in mental functioning.  Id.

Plaintiff claims the ALJ improperly disregarded the therapists' opinions, arguing that the therapists are Licensed Master's Level Psychologists qualifying as treating sources within the meaning of the regulations, and that the ALJ dismissed all of the GAF scores because of his own conclusion that the

scores reflect problems in areas other than "mental health functioning." (Pl. Br. 27). The Commissioner appears to agree that both therapists are "acceptable medical sources," but argues that neither therapist is a "treating source" since the record reflects only one visit to each therapist. He argues that the ALJ properly evaluated the therapists' opinions even if he erred in stating Ms. Frazee is not an "acceptable medical source."

A Licensed Master's Level Psychologist (LMLP) is a licensed psychologist in the state of Kansas, and has been found to be an "acceptable medical source" within the meaning of the regulations. West v. Barnhart, No. Civ. A. 02-1007, slip op. at 9-10 (D. Kan. May 5, 2003). Thus, plaintiff is correct to argue that the opinion of an LMLP should be evaluated as a medical opinion. (Pl. Br. 26)(citing http://www.ksbsrb.org/masters-psychologists.html.) Plaintiff asserts that both Ms. Frazee and Ms. Miller are Licensed Clinical Psychotherapists (LCP) which are, of necessity, also LMLPs. (Pl. Br. 26). The record reveals that plaintiff is correct as to Ms. Miller, but not as to Ms. Frazee. Ms. Miller signed her name with LMLP, LCP. As the Kansas Behavioral Sciences Regulatory Board web site reveals, an LMLP may seek licensing as a Licensed Clinical Psychotherapist (LCP) under certain conditions. As the record reveals, Ms. Miller is an LMLP who is also an LCP. Ms. Frazee, however, is an LPC. (R. 399, 400). The Kansas Behavioral Sciences Regulatory

Board web site reveals that LPC is the designation of a Licensed Professional Counselor, not a Licensed Clinical Psychotherapist. Kansas Behavioral Sciences Regulatory Board web site, available at: http://www.ksbsrb.org/pro-counselors.html last visited Dec. 11, 2007.  Although the two specialities are no doubt similar, one of the major differences between the two is that LMLP or LCP licensure requires a masters degree in the field of psychology whereas the LPC requires a masters degree in counseling.  Compare http://www.ksbsrb.org/masters-psychologists.html ; with http://www.ksbsrb.org/pro-counselors.html last visited Dec. 11, 2007.  Ms. Frazee is a Licensed Professional Counselor (LPC), not a licensed psychologist (LMLP or LCP) and, as determined by the ALJ, is not an "acceptable medical source."  It was not error for the ALJ to note that Ms. Frazee is not an "acceptable medical source."  Ms. Miller is an "acceptable medical source," and the ALJ did not find otherwise.

Neither therapist, however, qualifies as a "treating source" within the meaning of the regulations.  As the Commissioner argued, a "treating source" must have an ongoing treatment relationship with the claimant.  20 C.F.R. §§ 404.1502, 416.902. So far as the record reveals, each therapist had but a single examination of plaintiff.  (R. 399-400, 438).  In accordance with the definitions in the regulations, Ms. Miller, as a licensed psychologist is a "nontreating source" who examined plaintiff but

did not have an ongoing treatment relationship with plaintiff.
20 C.F.R. §§ 404.1502, 416.9 02.  Ms. Frazee is an "other medical
source" who did not have an ongoing treatment relationship with
plaintiff.  20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).

Although Ms. Frazee is an "other medical source," an ALJ
must:

> explain the weight given to opinions from these "other
> sources," or otherwise ensure that the discussion of
> the evidence in the determination or decision allows a
> claimant or subsequent reviewer to follow the
> adjudicator's reasoning, when such opinions may have an
> effect on the outcome of the case.

SSR 06-03p, West's Soc. Sec. Reporting Serv., Rulings 333 (Supp.
2007).  The Tenth Circuit recently recognized the procedures SSR
06-03p requires to be applied in evaluating the opinions of such
"other medical sources."  Frantz v. Astrue, ___ F.3d ___, ___,
No. 07-1057, slip op. at 4-7 (10th Cir. Dec. 12, 2007).

Here, the ALJ evaluated and explained his evaluation of the
opinions of Ms. Frazee and Ms. Miller.  He did not merely dismiss
Ms. Frazee's and Ms. Miller's GAF scores because of his own
medical judgment.  The ALJ noted that the GAF score assigned by
Ms. Frazee reflects factors in addition to mental functioning,
and he specifically mentioned that Ms. Frazee's evaluation
included stressors such as plaintiff's financial problems.  With
regard to the GAF assigned by Ms. Miller, the ALJ noted it
included considerations of severe problems in areas other than
mental functioning.  As discussed above, it is appropriate for

the ALJ in evaluating the severity of mental impairments at step
two of the evaluation process to consider only those factors
which relate to plaintiff's mental ability to perform basic work
activities.  Plaintiff points to no evidence that the areas
mentioned by the ALJ related to plaintiff's ability to perform
basic mental work activities.  Beyond her disagreement with the
weight assigned the various medical opinions, plaintiff points to
no evidence which establishes that the opinions of Ms. Frazee (an
"other medical source" who examined plaintiff one time) or Ms.
Miller (a "nontreating source" who examined plaintiff one time)
must in the circumstances of this case be accorded greater weight
than the opinions of Dr. Mintz (a "nontreating source" who
examined plaintiff one time) or of the state agency consultants
("nonexamining sources" who reviewed the record).  Plaintiff has
shown no error in the ALJ's consideration of the opinions of
plaintiff's therapists, plaintiff's chiropractor, Dr. Mintz, or
the state agency consultants.  The ALJ explained his
consideration and understanding of the opinions, and his findings
are supported by substantial evidence in the record.

Plaintiff submitted additional evidence to the Appeals
Council including medical records from Four County Mental Health
Center for the period from Nov. 8, 2005 through May 4, 2006.  (R.
14-25).  Those records include plaintiff's reports of mental
symptoms similar to those reported in medical evidence appearing

elsewhere in the record.  <u>Compare</u>, Dr. Drazek's report (R. 196-98)(depression, chronic pain, difficulty sleeping); Dr. Mendiola's records (R. 199-293)(depression, chronic pain); Dr. Jenkins's report (R. 330-33)(chronic pain); Dr. Mintz's report (R. 343-45)(chronic pain, depression, can't do things with grandson, unable to do past activities, low motivation, social withdrawal, reported memory loss, forgetfulness); Dr. Chase's records (R. 373-91)(depressed, reduced sleep, chronic pain, poor sleep, concentration diminished, isolative); <u>and</u> Ms. Frazee's report (R. 399-400)(not restful sleep, depression, no pleasure in activities, doesn't want to be around others, low self image, suicidal ideation but no plan).  The additional evidence includes GAF scores of 53 and 55 assigned by a social worker, Ms. McDonald, and a GAF score of 55 assigned by a psychiatrist, Dr. Williams.  (R. 14, 15, 21, 25).

The Appeals Council considered the additional evidence and determined there was no reason in the regulations to review the ALJ's decision.  (R. 6).  The Appeals Council denied review, stating (1) that the additional evidence is from a time period after the ALJ's decision and (2) that the additional evidence does not show a greater level of severity in plaintiff's impairments which relates back to the time period considered by the ALJ.  (R. 6-7).

Plaintiff claims the additional evidence establishes that plaintiff's mental impairments "would interfere or have a serious impact on her ability to do basic work activities" (Pl. Br. 28), and relates back to the time before the ALJ's decision because Ms. McDonald opined that plaintiff's GAF score of 53 was the highest GAF plaintiff had during the year before the GAF score was assigned.  (Reply 3).  While the court agrees with plaintiff that the GAF score assigned by Ms. McDonald refers to the period before the ALJ's decision, it also agrees with the Appeals Council that the additional evidence does not establish a greater level of severity in plaintiff's mental impairment than that found by the ALJ.

As demonstrated by the court's citations above to the administrative record, plaintiff's symptoms revealed in the additional evidence are the same as the symptoms revealed in the records before the ALJ.  Plaintiff does not point to evidence that establishes the severity of her mental impairment is worse than that considered and found by the ALJ.  The GAF scores assigned by Ms. McDonald and Dr. Williams are the same as those assigned by Ms. Frazee and Ms. Miller.  Plaintiff does not point to particular additional evidence that shows the ALJ missed the significance of the earlier evidence.  Plaintiff points to nothing in or about the new evidence that is different than that before the ALJ and which would cause or require the ALJ to change

his analysis and find that plaintiff's mental impairment is
"severe."  The court finds no error in the Appeals Council's
evaluation of the additional evidence.

In arguing that the ALJ erred in finding plaintiff's mental
impairment is not "severe," plaintiff argued that her daughter
attempted to testify at the hearing, that the ALJ did not allow
the testimony, and that the ALJ "erred by failing to consider the
third party opinion regarding Mrs. Bronson's impairments."  (Pl.
Br. 29)(citing Blea v. Barnhart, 466 F.3d 903, 915 (10th Cir.
2006)).  Plaintiff's argument is not entirely clear.  If
plaintiff is arguing that the ALJ erred in failing to consider
the third-party questionnaire her daughter completed, her
argument fails.  In Adams v. Chater, the Tenth Circuit declined
the "claimant's invitation to adopt a rule requiring an ALJ to
make specific written findings of each witness's credibility,
particularly where the written decision reflects that the ALJ
considered the testimony."  Adams v. Chater, 93 F.3d 712, 715
(10th Cir. 1996).  In Blea, cited by plaintiff, the Tenth Circuit
emphasized the portion of the Adams holding which would not
require specific written findings "only if 'the written decision
reflects that the ALJ considered the testimony.'"  Blea, 466 F.3d
at 915 (quoting Adams, 93 F.3d at 715).  Here, the ALJ noted and
summarized the daughter's third-party questionnaire.  (R. 47).
Subsequently, he made a credibility finding regarding that

questionnaire:  "The third party statement by the claimant's daughter does not reflect the activity levels reported by the claimant to her chiropractor and therefore is also not credible." (R. 51).  The decision reflects both that the ALJ considered plaintiff's daughter's third-party questionnaire and that he made a specific, written finding regarding the credibility of that report.

Perhaps plaintiff is arguing that the ALJ erred in not allowing plaintiff's daughter to testify at the hearing. However, plaintiff cites no authority for the general proposition that an ALJ must allow third-party testimony, for the proposition that the decision not to allow the testimony in this case in particular was error, or that plaintiff was prejudiced by that decision.  Plaintiff does not allege that her daughter would have provided any testimony in addition to the evidence provided in her third-party questionnaire which would indicate that plaintiff's mental impairment has more than a minimal effect on her ability to perform basic work activities.  In fact, plaintiff's only argument is the bare assertions that her daughter attempted to testify, the ALJ refused to allow the testimony, and the ALJ erred in failing to consider her daughter's opinion.

The transcript of the hearing reveals that plaintiff's attorney attempted to question plaintiff's daughter:

-27-

```
ATTY:      Your Honor, her daughter is here, I think
           some of the testimony would simply be
           corroborative.  If you'd like to hear from
           her.

ALJ:       Well, I usually don't call relatives and
           friends because usually it's just cumulative.
           I've often found that when they are called
           there's usually contradictory testimony that
           I have to deal with.

ATTY:      Um-hum.  I'll just proffer that the daughter
           would testify that, that, you, know, her
           mother cleans the house of a friend of theirs
           to make a little bit of money.  Then what the
           result of that is the daughter has to go over
           and clean the mother's house, she doesn't
           have the strength to do it after she's done
           the house she gets paid for.

ALJ:       And she does that house once a month?

ATTY:      Yes -- oh, no, once a week.

ALJ:       Once a week.

ATTY:      She's not required to move any furniture or
           do any heavy work anymore --
```

(R. 526-27).  At this point, the record reveals plaintiff

interrupted her attorney and the ALJ never returned to the

proffered testimony.

As the quoted colloquy reveals, plaintiff's attorney

suggested that the daughter's testimony would be cumulative

("corroborative").  However, he proffered that the daughter would

testify that plaintiff cleaned house for a friend once a week and

was thereafter unable to clean her own house and the daughter had

to clean plaintiff's house.  There is no indication in the

record, or argument in plaintiff's briefs that the daughter would

be able to present any other noncumulative testimony.  Moreover,
plaintiff does not explain how the proffered testimony might
suggest that plaintiff's mental impairment is "severe" within the
meaning of the Act.  Plaintiff shows no prejudice from the
decision to disallow the testimony.  At least as it relates to
the step two analysis, the court finds no error in the ALJ's
decision to disallow the testimony of plaintiff's daughter.

     Finally, plaintiff claims the ALJ found that plaintiff has
mild restrictions in activities of daily living; mild difficulty
maintaining social functioning; and mild difficulty maintaining
concentration, persistence, or pace; but erred by not including
these restrictions in his RFC assessment or in the hypothetical
question presented to the vocational expert.  (Pl. Br. 29).
Plaintiff's argument misses the difference between application of
the Psychiatric Review Technique at steps two and three and at
steps four and five of the sequential evaluation process.  If in
applying the technique, the Commissioner determines at step three
that plaintiff's mental impairments do not meet or equal a
listing, she will then assess plaintiff's RFC.  20
C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

     In determining RFC, the regulations provide that the
Commissioner will consider plaintiff's "ability to meet certain
demands of jobs, such as physical demands, mental demands,
sensory requirements, and other functions."  Id. §§ 404.1545(a),

416.945(a).  The Commissioner has clarified the difference
between evaluating the severity of mental limitations at steps
two and three based upon the functional areas identified in the
psychiatric review technique and evaluating the ability to meet
mental demands of jobs at steps four and five.  SSR 96-8p, West's
Soc. Sec. Reporting Serv., Rulings 147 (Supp. 2007).  "The mental
RFC assessment used at steps 4 and 5 of the sequential evaluation
process requires a more detailed assessment by itemizing various
functions contained in the broad categories found in" the four
functional areas.  Id.  RFC must be expressed in terms of work
related function.  Id. at 148.  "Work-related mental activities
generally required by competitive, remunerative work include the
abilities to:  understand, carry out, and remember instructions;
use judgment in making work-related decisions; respond
appropriately to supervision, co-workers and work situations; and
deal with changes in a routine work setting."  Id. at 149.
Therefore, an ALJ will not state a mental RFC in terms of the
four functional areas, but will make a function-by-function
assessment of each of the work-related mental activities relevant
to the case at hand.

Here, the ALJ applied the Psychiatric Review Technique, and
at step two evaluated the four basic functional areas and
determined that plaintiff's mental impairment is not "severe"
within the meaning of the regulations.  In other words, the ALJ

found that plaintiff's mental impairment has no more than a minimal effect on her ability to perform basic work-related mental activities.  Before evaluating step four, the ALJ assessed plaintiff's RFC.  (R. 50-53).  That RFC does not include any work-related mental limitations.

The ALJ found at step two of the sequential process that plaintiff has certain mild restrictions in mental functioning which have no more than a minimal effect on her ability to perform basic work activities.  The ALJ's RFC assessment reflects his finding that plaintiff's mild restrictions in mental functioning do not produce significant limitations in her residual functional capacities for understanding, carrying out, and remembering instructions; using judgment in making work-related decisions; responding appropriately to supervision, co-workers and work situations; or dealing with changes in a routine work setting.  Plaintiff argues that the ALJ did not include mild mental limitations in assessing plaintiff's RFC, but she does not point to specific limitations in the work-related mental activities described above which are contained in the evidence and which should have been included in the RFC assessment.

The court has considered all of plaintiff's arguments alleging error at step two, and finds no error in the Commissioner's step two evaluation.

IV.  **Step Five**

Plaintiff makes three specific claims of error at step five. First, she claims the ALJ erred in accepting the vocational expert's (VE) testimony that plaintiff's RFC reduces the range of light work available to plaintiff only by five to ten percent, because this reduction is not contained in the Dictionary of Occupational Titles (DOT) and was not properly explained by the vocational expert or the ALJ.  Second, she claims error in accepting the representative light work the VE said was available to plaintiff because that work requires frequent or constant reaching although the ALJ found plaintiff was incapable of reaching.  Finally, plaintiff claims the ALJ erred in using grid Rule 202.13 because the ALJ found nonexertional limitations including pain and postural limitations in plaintiff's RFC.  The Commissioner argues that the ALJ properly credited the VE testimony and properly used grid Rule 202.13 as a framework for decision and sought VE testimony to determine the amount of available work in the light exertion occupational base.  The court begins by addressing the propriety of relying upon the representative work the VE said was available for someone of plaintiff's age, education, experience, and RFC.

As plaintiff's brief suggests, the ALJ submitted interrogatories to the VE, and the VE provided answers.  (R. 184-85).  In her answers, the VE indicated that a person of plaintiff's age, education, work experience, and the RFC assessed

-32-

by the ALJ would have limitations in the occupational bases of
which she was capable.  (R. 185).  Specifically, she noted that
the medium occupational base was eliminated, the light
occupational base was reduced only by five to ten percent due to
postural limitations and limitations in overhead lifting or
reaching, and there was no reduction in the sedentary
occupational base.  Id.  The VE provided two representative
examples of sedentary work and two examples of light work of
which a person with the age, education, experience, and RFC of
plaintiff would be capable, and stated that to the best of her
knowledge, her responses are consistent with the DOT.  Id.  The
representative examples of light work provided by the VE are
"ticket seller, DOT code 211.467-030" and "photographic machine
operator, DOT code 207.685-018."  Id.

The ALJ provided a copy of the VE's responses to the
interrogatories to plaintiff and sought her response to the ALJ's
intention to include the interrogatories as evidence in the
record.  (R. 186-89).  Plaintiff made no comments regarding the
interrogatories, and did not immediately submit additional
evidence in that regard, but she did "request a **supplemental
hearing** to discuss [the] evidence."  (R. 190-91)(emphasis in
original).  Plaintiff's request was granted, and a supplemental
hearing was held on Apr. 27, 2005.  (R. 530-49).  At the
supplemental hearing plaintiff did not attack the qualifications

of the VE or seek to have her testimony excluded from the record. She does not do so here.

Plaintiff claims that the representative light work proposed by the VE (ticket seller, and photographic machine operator), require frequent or constant reaching but the RFC assessed for plaintiff precludes reaching, and, therefore, the two light representative jobs must be eliminated.  Plaintiff is correct that the two representative jobs require frequent or constant reaching, but that does not establish error in the ALJ's reliance on those jobs as testified by the VE.  Plaintiff's argument misconstrues the RFC assessed in this case.  The RFC assessed included nonexertional limitations:

> The claimant has nonexertional limitations of no more than occasional balancing, climbing, stooping, kneeling crouching, and crawling as a result of neck and back pain and to avoid exacerbating headaches.  She must avoid <u>overhead lifting and reaching</u>.

(R. 52)(emphasis added).

Plaintiff attempts to assert the ALJ found plaintiff must avoid reaching.  However, the RFC applied the qualifier "overhead" in the phrase requiring that plaintiff avoid lifting and reaching ("avoid overhead lifting and reaching").  Therefore, the natural sense of the RFC assessment is that plaintiff must avoid overhead reaching and overhead lifting.  The RFC does not preclude reaching or lifting that does not constitute overhead reaching or lifting.  To apply the sense in which plaintiff

-34-

attempts to understand the RFC finding, the decision would have needed a comma placed after "lifting," (overhead lifting, and reaching), or it might have been phrased, "avoid reaching or overhead lifting." The ALJ used neither technique, and the court will not strain for a meaning beyond the natural sense of the phrase.

The court's understanding of the ALJ's RFC assessment is supported by the very facts upon which plaintiff relies to assert error. The interrogatories presented to the VE included an RFC finding "No overhead lifting or reaching." (R. 185). The VE stated that the light occupational base is reduced five to ten percent "with regard to postural limits & overhead lifting or reaching." Id. Thereafter, the VE stated that ticket seller, and photographic machine operator were representative jobs available to plaintiff, provided specific DOT codes for each job, and stated that her responses were consistent with the DOT. Id. However, as plaintiff argued, each job requires constant or frequent reaching. The most reasonable resolution of these facts is that the VE understood the RFC to preclude overhead reaching but not reaching elsewhere. Otherwise, one must assume either that the VE is not an expert or that she utterly failed to compare the RFC given with the DOT code she supplied in response to the interrogatories for the representative work suggested. In the facts of this case, and accepting the natural sense of the

-35-

ALJ's RFC assessment, there is no need to make either assumption, and the court will not accept plaintiff's suggestion.  The court finds no error in accepting the representative jobs suggested by the VE.

Plaintiff claims that because the DOT does not contain evidence that the light occupational base is reduced five to ten percent as a result of postural activities being limited to occasional, and overhead lifting and reaching being precluded, it was error for the ALJ to accept the VE's assertion to that effect.  Plaintiff claims that the VE's assertion is inconsistent with the DOT and the ALJ was, therefore, required to provide a reasonable explanation for the inconsistency if he is going to rely upon the VE's assertion.  (Pl. Br., 22)(citing Haddock v. Apfel, 183 F.3d 1225, 1231 (10th Cir. 1999)[3].

In November, 1999, the Tenth Circuit decided that before an ALJ may rely on VE testimony, the ALJ has a duty to ask the VE how the testimony corresponds with the DOT and to elicit a reasonable explanation for any conflict.  Haddock v. Apfel, 196 F.3d 1084, 1089 (10th Cir. 1999).  The court made clear that the DOT does not "trump" VE testimony, but the ALJ has a duty to investigate and get a reasonable explanation before he may rely on the VE testimony.  Id. at 1091.

---

[3]The opinion plaintiff cited was superseded by Haddock v. Apfel, 196 F.3d 1084 (10th Cir. 1999).

On June 20, 2000, the Commissioner published Acquiescence
Ruling 00-3(10) in which she explained that she would apply the
holding of Haddock within the Tenth Circuit although that holding
conflicted with her interpretation of the Act.   Acquiescence
Ruling 00-3, West's Soc. Sec. Reporting Serv., Rulings, 480 (2007
Supp.).   Thereafter, the Commissioner published SSR 00-4p,
effective December 4, 2000.   West's Soc. Sec. Rep. Serv.,
Rulings, 242 (Supp. 2007).   In SSR 00-4p, the Commissioner
rescinded Acquiescence Ruling 00-3(10), and established a policy
interpretation for the use of VE testimony and "Other Reliable
Occupational Information in Disability Decisions."   Id. at 243.
In the ruling, the Commissioner placed two duties on the ALJ.
First, the ALJ must "identify and obtain a reasonable explanation
for any conflicts between occupational evidence provided by VEs
. . . and information in the Dictionary of Occupational Titles
(DOT), including its companion publication, the Selected
Characteristics of Occupations Defined in the Revised Dictionary
of Occupational Titles (SCO)."   Id. (emphasis added).

Second, the ALJ was given the duty to "[e]xplain in the
determination or decision how any conflict that has been
identified was resolved."   Id.   Ruling 00-4p places the
affirmative responsibility on the ALJ to "[a]sk the VE . . . if
the evidence he or she has provided conflicts with information
provided in the DOT," and where VE "evidence appears to conflict

-37-

with the DOT, . . . [to] obtain a reasonable explanation for the apparent conflict." Id. at 246.

Thus, the ALJ in this case had a duty to identify any conflicts between the DOT and the VE testimony and to explain how those conflicts were resolved.  Plaintiff claims there is such a conflict in this case which the ALJ failed to identify and resolve.  The court disagrees.  The Commissioner takes notice of reliable job data such as in the DOT.  20 C.F.R. §§ 404.1566(d), 416.966(d).  The Commissioner also uses vocational experts to help resolve complex occupational issues.  Id. §§ 404.1566(e), 416.966(e).  This case illustrates the need for both sources of occupational expertise.  The DOT contains data regarding the broad range of individual occupations available within the economy and classifies these occupations according to several criteria including exertional level.  Within the sedentary classification, the Commissioner recognizes approximately 200 unskilled occupations; 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 201.00(a); and approximately an additional 1400 unskilled occupations within the light classification.  20 C.F.R., Pt. 404, Subpt. P, App. 2 § 202.00(a).  Each occupation classified as "light" in the DOT has particular requirements regarding postural and manipulative abilities.  For example, as discussed above the light occupations provided as representative occupations of which plaintiff is capable require constant or frequent reaching.

Certain light occupations may require occasional postural activities, while others may require frequent postural activities.

It is partly for this reason that the ALJ in this case sought VE testimony.  He asked the VE how much each occupational base was reduced by the RFC assessed in this case, and the factors which required that reduction in the occupational base. (R. 185).  The VE responded that the occasional postural limitations and the limitations on overhead reaching and lifting would reduce the light occupational base of 1400 occupations by five to ten percent.  (R. 185).  This information does not conflict with the DOT, but specifically relies upon the DOT for its significance.  The VE did not present information in addition to or inconsistent with the DOT, but she interpreted the DOT and explained to the ALJ its significance in this particular case. Plaintiff does not object to the qualifications of the VE, and has shown no error or inconsistency in the VE testimony.  She merely argues that the VE testimony is inconsistent with the DOT, but it is not.

The ALJ fulfilled his duty pursuant to SSR 00-4p and Haddock.  He sought to identify any conflicts between the DOT and the VE testimony, and found none.  Plaintiff does not identify any conflict.  The court finds no error in accepting the VE testimony.

-39-

Finally, plaintiff claims the ALJ erred in using grid Rule 202.13 to determine that plaintiff is not disabled.  Plaintiff quotes <u>Frey v. Bowen</u>, 816 F.2d 508, 512 (10th Cir. 1987) for the proposition that the grids may not be used when a nonexertional impairment limits a claimant's ability to perform the full range of work in a particular occupational base.  (Pl. Br. 30-31)(quoting <u>Frey</u>, 816 F.2d at 512; and citing <u>Espinoza v. Sec'y or Health and Human Servs.</u>, 565 F. Supp. 810, 815 (D. Kan. 1983)).  Therefore, plaintiff argues that the five to ten percent reduction in the light occupational base caused by postural and manipulative limitations precludes use of the grids in this case. The Commissioner argued that only the conclusive use of the grids is precluded in such a case, but that the ALJ in this case properly used the grids as a framework and concluded, based upon the VE's answers to the interrogatories, that plaintiff is able to perform work existing in significant number in the economy. The court agrees with the Commissioner.

In the grids, the Commissioner has provided a tool to aid in making uniform, efficient decisions in determining the types and numbers of jobs existing in the national economy for certain classes of claimants.  <u>Heckler v. Campbell</u>, 461 U.S. 458, 468 (1983).  However, the grids are applicable "only when they describe a claimant's abilities and limitations accurately."  <u>Id.</u> 461 U.S. at 462 n.5; <u>see also</u> <u>Channel v. Heckler</u>, 747 F.2d 577,

-40-

579 (10th Cir. 1984).  Because the grids are based upon the

physical exertion requirements for work in the national economy,

they may not be fully applicable for claimants who have

nonexertional limitations.  Channel, 747 F.2d at 580.  Realizing

this limitation on the use of the grids, the Commissioner has

promulgated a procedure for evaluating claims where both

exertional and nonexertional limitations are present:

> (2) [W]here an individual has an impairment or
> combination of impairments resulting in both strength
> limitations and nonexertional limitations, the rules in
> this subpart are considered in determining first
> whether a finding of disabled may be possible based on
> the strength limitations alone and, if not, the rule(s)
> reflecting the individual's maximum residual strength
> capabilities, age, education, and work experience
> provide a framework for consideration of how much the
> individual's work capability is further diminished in
> terms of any types of jobs that would be
> contraindicated by the nonexertional limitations.

20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e)(2); see

also Channel, 747 F.2d at 580-81.

The grids direct a finding in a particular case only when

there is an "exact fit" between the criteria of the grid and the

situation before the ALJ.  Campbell, 461 U.S. at 468; Channel,

747 F.2d at 579.  Where the grid rules do not direct a finding,

"full consideration must be given to all of the relevant facts in

the case in accordance with the definitions and discussions of

each factor in the appropriate sections of the regulations which

will provide insight into the adjudicative weight to be accorded

each factor."  20 C.F.R., Pt. 404, Subpt. P, App. 2

§ 200.00(e)(2); <u>see</u> <u>also</u> <u>Channel</u>, 747 F.2d at 579-82 (application of the grids where nonexertional limitations are present).

Where plaintiff is unable to do a full range of work in an exertional category, the ALJ may not conclusively apply the grids.  <u>Channel</u>, 747 F.2d at 582 (error to apply the grids absent a finding that plaintiff could perform the full range of sedentary work).  Instead, he "must give 'full consideration' to 'all the relevant facts,' App. 2, § 200.00(e)(2), including expert vocational testimony if necessary, in determining whether [plaintiff] is or is not disabled." <u>Channel</u>, 747 F.2d at 583. Where nonexertional limitations affect the range of work of which plaintiff is capable, the grids may serve only as a framework to assist in determining whether sufficient jobs exist in the national economy given plaintiff's limitations and characteristics.  <u>Gossett v. Bowen</u>, 862 F.2d at 806.

The cases cited by plaintiff do not compel a different result.  In <u>Frey</u>, the court stated the principle, "When an individual suffers from both exertional and nonexertional impairments, the [Commissioner's] regulations mandate that the grids be applied first, to determine whether the claimant is disabled by reason of the exertional impairments alone." <u>Frey</u>, 816 F.2d at 513.  The court concluded:  "If the claimant is not so disabled, the ALJ must then make a second individualized determination using the grids only as 'a framework for

-42-

consideration of how much the individual's work capability is
further diminished in terms of any types of jobs that would be
contraindicated by the nonexertional limitations.'" Id. (quoting
20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e)(2); and citing
Teter v. Heckler, 775 F.2d 1104, 1105 (10th Cir. 1985)).  While
the Espinosa opinion uses expansive language which might suggest
use of the grids is completely foreclosed except where there is
an exact match between the grid criteria and plaintiff's RFC,
that opinion is not binding on this court, and was decided prior
to all of the Supreme Court and Tenth Circuit precedent cited
above, including Campbell, Channel and Frey which are binding
upon this court.  Moreover, in Espinosa the court noted that no
vocational expert testimony was used to meet the Commissioner's
burden to establish that there is work available in the economy
of which plaintiff was capable.  Here, as distinguished from
Espinosa, there is VE testimony to the effect that plaintiff's
RFC would only exclude about five to ten percent of the light
occupational base.

As the Commissioner pointed out in his brief, the ALJ stated
that in a case such as this when plaintiff cannot perform all of
the exertional demands of work at a given level of exertion, the
grids "are used as a framework for the decision." (R. 53).  The
ALJ then explained that if plaintiff was able to perform the full
range of light work, Rule 202.13 would direct a finding of "not

disabled." (R. 53).  He noted that plaintiff has nonexertional limitations reducing the range of light work of which she is capable, that in accordance with the VE's answers approximately ninety to ninety-five percent of the light occupational base is available for an individual with plaintiff's RFC, and that the VE explained that light jobs such as ticket seller and photographic machine operator are within plaintiff's RFC.  (R. 53-54). Finally, the ALJ concluded, "Based on the testimony of the vocational expert, the undersigned has concluded that considering the claimant's age, educational background, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to work that exists in significant numbers in the national economy." (R. 54).  The decision reveals that the ALJ did not apply the grids conclusively, but properly used grid Rule 202.13 as a framework for decision and concluded that there are a significant number of jobs available of which plaintiff is capable.  The court finds no error in the ALJ's use of the grids at step five of the sequential evaluation process.

     **IT IS THEREFORE RECOMMENDED** that JUDGMENT be entered in accordance with the fourth sentence of 42 U.S.C. § 504(g) AFFIRMING the Commissioner's decision.

     Copies of this recommendation and report shall be delivered to counsel of record for the parties.  Pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), and D. Kan. Rule 72.1.4, the

parties may serve and file written objections to this recommendation within ten days after being served with a copy. Failure to timely file objections with the court will be deemed a waiver of appellate review.  <u>Hill v. SmithKline Beecham Corp.</u>, 393 F.3d 1111, 1114 (10th Cir. 2004).

Dated this 21st day of December 2007, at Wichita, Kansas.


s/John Thomas Reid
**JOHN THOMAS REID**
**United States Magistrate Judge**